UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

       v.                                No. 17-cr-89

JAMES AUBREY KITCHEN,         HON. JANET T. NEFF
                                           United States District Judge
        Defendant.
_____/

**BRIEF OF UNITED STATES IN OPPOSITION TO DEFENDANT'S
<u>MOTION TO SUPPRESS</u>**

Defendant James Aubrey Kitchen has moved to suppress evidence, asserting that the application for a search warrant that led to the seizure of narcotics, firearms, and drug paraphernalia from his residence lacked probable cause. To the contrary, the continuation to the application supplied the requisite probable cause, and, even if it did not, the officers relied on the warrant in good faith. Consequently, the motion should be denied, and, because the matter can be decided on the briefing, there is no need for a hearing under Federal Rule of Criminal Procedure 12.

    **I.      FACTUAL BACKGROUND**

The search of Kitchen's residence resulted from an investigation into the drug-trafficking activities of his co-defendant and putative cousin, Alfonzo Johnson. The continuation to the application for the search warrant recounts the information that led to the search. That information primarily came from two reliable confidential sources, who independently established that Johnson was trafficking large quantities of crystal methamphetamine, cocaine, and other substances. The continuation also established probable cause to believe Johnson was

using two stash locations, Kitchen's residence on Green Street and co-defendant Demarco Knox's residence on Fielstra Avenue. The continuation was attached to two separate applications, for two separate warrants, one for each of those locations.[1] The Green Street warrant and application were filed under case number 1:17-mj-00067.

Focusing on the probable cause that controlled substances would be found at the Green Street location, the continuation describes how agents conducted controlled purchases from Johnson three times between December 2016 and January 2017, buying ounce-quantities of crystal methamphetamine each time (the methamphetamine field-tested positive as noted in the continuation, and laboratory purity testing is pending). Specifically, on January 5, 2017, law enforcement officers conducted a controlled purchase of crystal methamphetamine from Alfonzo Johnson by a confidential source ("CS1"). At the time, Johnson's vehicle was being tracked pursuant to a state search warrant. The tracker revealed that Johnson visited the Green Street location before proceeding to the prearranged location to meet CS1. Johnson then sold 53.6 grams of crystal methamphetamine to CS1 for $2,200. (1:17-mj-00067 PageID.9-10.)

---

[1] Kitchen obliquely attacks the particularity of the warrant to search the Green Street location because the Drug Enforcement Administration ("DEA") applied for two warrants, using two applications, that shared the same continuation. (PageID.124-25.) But the shared cause supplied by the continuation cannot undermine the particularity of the Green Street warrant, in part because the separate application, with a separate Attachment A describing only Green Street as the location to search pursuant to that warrant, was unambiguous as to the property the agents were proposing to be searched, and which Judge Carmody authorized to be searched. *See, e.g., United States v. Crumpton*, 824 F.3d 593, 612 (6th Cir. 2016) ("In determining whether a warrant describes with sufficient particularity the place to be searched, we consider: (1) whether the place to be searched is described with sufficient particularity as to enable the executing officers to locate and identify the premises with reasonable effort; and (2) whether there is reasonable probability that some other premises may be mistakenly searched." (internal quotation marks omitted)). Moreover, because both warrant applications relied on shared facts to demonstrate probable cause that crimes were being committed—specifically that both locations were being used by Alfonzo Johnson and his associates to traffic controlled substances—it was entirely appropriate, and more efficient, to include all of those facts in one document, rather than require the reviewing judge to read the narrative multiple times.

CS1 arranged another controlled purchase from Johnson on January 27, 2017.  Shortly after agreeing to the deal, Johnson called CS1 and stated that he was assembling the order and wanted to confirm the quantity to deliver to CS1.  The GPS tracker on Johnson's vehicle indicated that it was at the Green Street location around the time of the call.  Shortly after, according to the tracker, Johnson travelled directly from the Green Street location to meet CS1.  Investigators then maintained visual surveillance of Johnson selling 27.3 grams of crystal methamphetamine and 5.7 grams of heroin to CS1 for $1,500.  As with the methamphetamine, the heroin field-tested positive.  (1:17-mj-00067 PageID.10.)

On February 8, 2017, CS1 informed investigators that Johnson said that his supply of drugs was low, but he expected to have more soon.  On February 12, 2017, U.S. Customs and Border Protection contacted Homeland Security in Grand Rapids to report that Johnson and Devanda Montgomery, also a co-defendant in this case, had entered the United States at the Mexican border in Arizona.  Records from American Airlines indicate that on February 5, 2017, Johnson and Montgomery purchased tickets to fly from Grand Rapids to Phoenix on February 9, using a prepaid Visa card.  (1:17-mj-00067 PageID.11.)

Another source, "CS2," informed investigators that he picked up Johnson and Montgomery at the Gerald R. Ford International Airport in Grand Rapids on February 14, 2017, and drove them to Muskegon.  During the trip, Johnson told CS2 that he and Montgomery had just returned from visiting drug contacts in Mexico.  Johnson and CS2 began to arrange a future drug deal in which CS2 would buy crystal methamphetamine and multiple kilograms of cocaine.  Johnson offered to sell each kilogram for $36,000.  (1:17-mj-00067 PageID.11-12.)

Two days before the DEA applied for and received the warrants, on March 3, 2017, both sources said Johnson told them he would be receiving drugs soon.  CS2 provided agents with a

3

screenshot of a text message from Johnson in which he wrote, "Be gettn ur points together I will be on u sooner than u think." The applicant explained that investigators believed "points" to mean money. (1:17-mj-00067 PageID.12.)

The next day, both sources said, Johnson disclosed he had received his shipment of cocaine. At around 2 pm, CS2 told investigators Johnson had contacted him and said that he (Johnson) was preparing five kilograms of cocaine for him. The GPS tracker indicated Johnson's vehicle was at the Green Street location at 2:10 pm. Around 3 pm, the source informed investigators that Johnson told him the five kilograms were ready and provided agents with a screenshot of a text message so indicating, and that was around the time the tracker indicated Johnson left the Green Street location. Around 3:45 pm, the other source said Johnson gave him an impromptu sample of cocaine from the shipment he had received so that an associate could try the cocaine. That sample field-tested positive. Just after 4 pm, the tracker placed Johnson at the Fielstra Avenue location. (1:17-mj-00067 PageID.13.)

Based on this information, and additional information contained in the application, the DEA applied to the Honorable Ellen S. Carmody, United States Magistrate Judge, for a warrant to search the Green Street location. The warrant was issued and executed on March 5, 2017.

As part of the operation to execute that warrant (and others), a source placed an order from Johnson at law enforcement's direction. After agreeing to the deal, Johnson was surveilled going to the Green Street location, briefly stopping, and then traveling in the direction of the prearranged meet location. The Michigan State Police ("MSP") stopped Johnson in the vehicle. Devanda Montgomery was in the driver's seat. Officers searched the vehicle as well as both occupants, and discovered, among other items, approximately 127 grams of cocaine, approximately 112 grams of crystal methamphetamine, two cell phones, and $779. After MSP

secured Johnson and Montgomery, law enforcement executed the warrant at Kitchen's residence. Kitchen was the lone occupant of the Green Street location at the time of execution.

Inside, agents seized approximately 4.5 kilograms of crystal methamphetamine, approximately 8.7 kilograms of cocaine, a marijuana grow operation, cutting agent, a loaded 12-gauge Mossberg pump-action shotgun, a loaded .40 caliber Smith & Wesson handgun, ammunition, two cell phones, a mechanical press, and residency documents. The guns were located in the master bedroom and the drugs were in the kitchen, living room, and basement. Inside the garage agents found a 2007 Honda Ridgeline pickup truck. The vehicle was registered to Carlos Robles in Arizona, and had a second Pennsylvania license plate inside of the car. Agents found false compartments and air sanitizers in the vehicle. In a post-Miranda statement, Kitchen denied knowing the drugs were in his house, but he admitted that Johnson had access to his house, that Johnson was a drug dealer, and that the trap vehicle had been dropped off by Johnson two days earlier.

## II. LEGAL STANDARD

"Probable cause . . . is not a high bar: It requires only the 'kind of fair probability on which reasonable and prudent [people,] not legal technicians, act.'" *Kaley v. United States*, 134 S. Ct. 1090, 1103 (2014) (alteration in original) (internal quotation marks omitted). Probable cause exists to issue a search warrant when there is a "fair probability," given the totality of the circumstances, "that contraband or evidence of a crime will be found in a particular place." *United States v. Powell*, 847 F.3d 760, 769 (6th Cir. 2017) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The probable cause standard is a "practical, non-technical conception" that deals with the "factual and practical considerations of everyday life." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (quoting *Gates*, 462 U.S. at 231).

When evaluating whether an affidavit supplied probable cause, a reviewing court extends "great deference" to the issuing magistrate's determination. *United States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009) (citing *Gates*, 462 U.S. at 238-39). Suppression is warranted only if the judge "arbitrarily exercised his or her authority." *United States v. Brown*, 732 F.3d 569, 573 (6th Cir. 2013). The question is "whether the magistrate had a substantial basis for finding that the affidavit established probable cause." *Id.* (internal quotation marks omitted); *accord, e.g.*, *United States v. Kinison*, 710 F.3d 678, 682 (6th Cir. 2013). Line-by-line scrutiny of the affidavit is inappropriate, *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004), and the reviewing court limits its analysis to the "information presented in the four corners of the affidavit." *United States v. Church*, 823 F.3d 351, 360 (6th Cir. 2016) (citing *Frazier*, 423 F.3d at 531). To prevail on a motion to suppress, the defendant bears the burden of proving some constitutional or statutory violation justifying suppression. *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003).

Even when an affidavit does not supply probable cause, the evidence remains admissible so long as the searching officers acted in good faith and seized evidence in "objectively reasonable reliance" on the warrant. *United States v. Leon*, 468 U.S. 897, 921-22 (1984); *see also United States v. Hython*, 443 F.3d 480, 484 (6th Cir. 2006). The good-faith exception does not apply in four instances:

> (1) when the affidavit supporting the search warrant contains a knowing or reckless falsity; (2) when the magistrate who issued the search warrant wholly abandoned his or her judicial role; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; or (4) when the warrant is so facially deficient that it cannot reasonably be presumed valid.

*United States v. McPhearson*, 469 F.3d 518, 525 (6th Cir. 2006).

The Court must hold an evidentiary hearing on a motion to suppress "only if the motion is sufficiently definite, specific, detailed, and non-conjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Abboud*, 438 F.3d 554, 577 (6th Cir. 2006) (internal quotation marks omitted). A defendant who raises only legal arguments is not entitled to an evidentiary hearing. *United States v. Knowledge*, 418 F. App'x 405, 408 (6th Cir. 2011) (internal quotation marks omitted). "Challenges to the existence of probable cause . . . are questions of law" that can be resolved without an evidentiary hearing. *United States v. Lawhorn*, 467 F. App'x 493, 495 (6th Cir. 2012).

### III.   ARGUMENT

The application for the search warrant supplied probable cause, and this Court should defer to Judge Carmody's decision to issue the warrant. Should this Court find otherwise, the evidence remains admissible because an objectively reasonable officer would have relied on the warrant in good faith. These issues are legal in nature and can be resolved without an evidentiary hearing.

### A. This Court Should Defer to the Magistrate Judge's Determination That the Application Supplied Probable Cause.

Kitchen's sole argument is that the facts contained in the continuation are insufficient to establish a fair probability that the items identified in the warrant would be found in his house. Kitchen hinges his nexus argument on two basic points: (1) officers did not visually observe Johnson at Kitchen's residence, and (2) the GPS data is not reliable evidence of Johnson's location. (PageID.127-31.) Kitchen offers no authority in support of either the proposition that the former is required for a finding of probable cause or that GPS tracker information is unreliable. And although he pigeonholes the continuation by focusing his attention on paragraphs where the Green Street location is explicitly referenced, remarkably criticizing the

7

application for "mention[ing] it only 6 times," (PageID.127), this Court reviews the application as a whole.  *E.g.*, *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000).

      Beginning with the application Judge Carmody reviewed, it contained the following facts in support of the search of the Green Street location: (1) two controlled buys approximately two months and five weeks prior to the search in which Johnson was at the Green Street location before the buy; (2) information from the GPS trackers that Johnson was at the Green Street location, which was not his residence, more than once a day, on average, during the 48 days sampled within three months of the search; (3) ninety-nine telephonic contacts between Johnson and Kitchen in an approximately two-month period sampled within approximately three months of the search; (4) information from the sources and controlled buys indicating that Johnson was involved in importing controlled substances from Mexico for redistribution in West Michigan; (5) near-real-time information from two sources in the two days leading up to the search that Johnson had received the shipment of drugs in early March and that he was preparing to deliver them; and (6) GPS location information indicating that when he told one of the sources that he was preparing the drugs, he was at the Green Street location.

      In similar cases involving a pattern of observation of controlled buys originating from a stash house, other indicia of trafficking activity by a person associated with that location, and fresh information that drugs are at that location, courts find that there is probable cause to search the location.  For example, in *United States v. Burney*, 778 F.3d 536 (6th Cir. 2015), agents observed a pattern of suspected drug activity originating from a stash house over the course of several months.  *Id.* at 538-39.  On one occasion, after an informant arranged for a controlled purchase of cocaine, agents observed the dealer travel to the defendant's residence, briefly go inside, and then proceed directly to the prearranged meet location.  *Id.* at 538.  In the months

following the controlled purchase, law enforcement observed the dealer's vehicle at the defendant's residence on several other occasions. *Id.* at 539.

Challenging the magistrate's probable cause determination, the defendant argued that the last time police actually observed the dealer at his residence was eight months before the search, rendering the evidence stale and insufficient to sustain probable cause. *Id.* at 540. The Sixth Circuit rejected this contention, noting that the "police had, on more recent occasions, seen [the dealer's] vehicles parked at the residence. That they did not observe [the dealer] in the flesh . . . does not mean that they could not reasonably conclude that he was inside." *Id.* Coupling this fresh information of continuing drug activity at the residence with the instance of the dealer briefly visiting just before the controlled purchase, the court held that probable cause existed to search the residence. *Id.* at 539-40.

Likewise, in *Marcilis v. Township of Redford*, 693 F.3d 589 (6th Cir. 2012), a search warrant issued based on a controlled purchase at one of two suspected stash houses within days of the submission of the affidavit and other indicia of drug trafficking activity over a six-month period, including other controlled purchases and surveillance of the dealer briefly visiting both suspected stash houses during multiple drug transactions. *Id.* at 600. Holding that these facts established probable cause, the Sixth Circuit noted that the fresh information had a corroborating effect on the older evidence, and collectively established a sufficient nexus of continuing drug activity at both stash locations to permit a search. *Id.* at 601; *see also United States v. Thomas*, 605 F.3d 300, 309-10 (6th Cir. 2010) (applying freshening principle in reasoning that utility bills corroborated an eight-month old tip from an informant that the defendant grew marijuana when the usage data showed a pattern of abnormally high energy use at the defendant's residence); *United States v. Palega*, 556 F.3d 709, 714-15 (8th Cir. 2009) (affirming denial of motion to

9

suppress drug evidence based on information from multiple informants and rejecting staleness argument related to evidence as old as two years because "the affidavit describes a continuing pattern of behavior").

Although the facts in these and other cases differ somewhat from the case at-hand—as all probable-cause determinations will, *see, e.g.*, *Ornelas v. United States*, 517 U.S. 690, 703 (1996) (Scalia, J., dissenting) (lamenting "the futility of attempting to craft useful precedent from the fact-intensive review demanded by determinations of probable cause"); *Gates*, 462 U.S. at 238 n.11 ("There are so many variables in the probable cause equation that one determination will seldom be a useful 'precedent' for another."), the nexus between Kitchen's residence and drug trafficking is at least as strong as that in the cases described above. For example, unlike the lone instance of the drug dealer in *Burney* visiting the suspected stash location before traveling to a drug sale, Johnson briefly stopped at Kitchen's residence before distributing drugs on two separate occasions (in addition to a third after the warrant issued but before it was executed). And compared to the general averment that officers frequently observed the dealer's vehicle at Burney's residence, the continuation here provides comprehensive, specific, and reliable information showing that Johnson visited the residence 66 times in 48 days and communicated with Kitchen 99 times in two months. Further, law enforcement had real-time intelligence from two confidential sources in the days leading up to the search that Johnson had recently resupplied his drug stash, and the totality of information available to law enforcement indicated that he was preparing those drugs for resale while at the Green Street location. In short, the application provided more than a substantial basis to connect Johnson's continued distribution of large quantities of drugs with Kitchen's residence.

Kitchen attempts to undermine the cause supplied in the application by observing the absence of certain factual assertions, but he points to no authority stating that such assertions are required to obtain a warrant, nor could he given the fact-specific nature of the review. *See Thomas*, 605 F.3d at 309 ("The problem with Thomas' arguments . . . is that [it] focus[es] on what the affidavit lacks. . . . When scrutinizing each line of an affidavit, one could always find some question left unanswered or some issue unresolved."). In particular, Kitchen argues that the continuation includes "no averments about the reliability" of GPS trackers, and without visual observation of Johnson at Kitchen's residence, the Court should discount proof of Johnson's repeated visits. (PageID.129.) This argument is unavailing for at least two reasons. First, the continuation does explain the reliability of the particular GPS device utilized in this investigation. According to the applicant, the tracking devices used in this investigation "are precise enough to indicate that a vehicle is at a particular residence, but occasionally the signal will indicate that the tracker is at a residence that is adjacent to . . . where the tracker is in fact located." (1:17-mj-00067 PageID.7.) Second, Judge Carmody could evaluate the facts in the continuation as presented: if the absence of more detailed information about GPS trackers, for example, in fact made the application less compelling in her judgment, Judge Carmody would have weighed that absence in deciding whether to issue the warrant.

Kitchen analogizes location tracking technology to unverified hearsay statements from an "uncorroborated informant," (PageID.129), but he does not tell us why they are similar, and the analogy is inapt. At most, the analogy teaches that different kinds of evidence should be assigned different weights by a reviewing magistrate judge, but that tautology does not reveal why this application lacked probable cause. To the extent the specificity of the GPS tracker information was not as compelling as visual surveillance would have been, Judge Carmody was

11

able to judge the facts as a part of the totality of those presented in the continuation. Kitchen argues that minor imprecision in the GPS tracker should have led Judge Carmody to discount Johnson's 66 trips to Kitchen's residence because law enforcement did not concurrently observe Johnson walking through the front door. But this assertion ignores the evidence that Johnson was visiting Kitchen and not Kitchen's neighbor: tolls of the extensive communications between Johnson's phone and Kitchen's.

Kitchen also quotes extensively from *United States v. Frazier*, 423 F.3d 526 (6th Cir. 2005), in support of his claim that probable cause did not exist. In *Frazier*, investigating agents learned from confidential informants that the defendant was selling drugs out of an apartment complex. *Id.* at 529-30. Although agents conducted multiple controlled purchases from Frazier's associates to buttress the informants' reliability, the affidavit supporting the warrant for Frazier's residence failed to note that the controlled purchases were recorded even after the magistrate judge's request that that information be included, and contained no information linking drug activity to Frazier's residence. *See id.* at 530. The magistrate judge issued the warrant anyway, "[a]pparently unaware that [the agent] had not made all of the requested changes." *Id.* Lacking essential indicia of reliability, the Sixth Circuit held that when "the warrant affidavit is based almost exclusively on the uncorroborated testimony of unproven confidential informants," the "allegation that the defendant is a drug dealer, without more, is insufficient to tie the alleged criminal activity to the defendant's residence." *Frazier*, 423 F.3d at 533. The court nonetheless affirmed the denial of the motion to suppress on the basis of the good-faith exception to the exclusionary rule. *Id.* at 533-39.

The contrast between Kitchen's claim and Frazier's is stark. In the case of the latter, the government had only the fact of Frazier's "status as a drug dealer," *id.* at 533, which did not

provide a sufficient nexus to his residence to sustain a finding of probable cause. In other words, there was no reason to believe that evidence would be found at the searched location. Here, the continuation is replete with specific and reliable information establishing a nexus between Johnson's trafficking activity and Kitchen's residence: two reliable informants independently provided consistent intelligence that Johnson had received a shipment of drugs; their assertions were corroborated by, among other things, telephone and airline records; and the GPS tracker placed Johnson at the Green Street location, the same location he had visited before two prior controlled buys, while he was preparing the newly received drugs for sale. *Frazier* does not inform the analysis of these facts.

In sum, Judge Carmody correctly determined that the application provided a fair probability that evidence of drug trafficking would be found in Kitchen's home. This Court should, as a result, defer to that determination as the Judge who issued the warrant. Consequently, Kitchen's motion should be denied because the continuation supplied probable cause.

### B.  In the Alternative, the Officers Relied on the Warrant in Good Faith.

Even if this Court finds that the warrant was not supported by probable cause, the evidence seized from Kitchen's residence is still admissible because the officers relied on the warrant in good faith. Their reliance, premised on a thirteen-page continuation reciting all of the facts discussed above, was objectively reasonable. *See, e.g.*, *Frazier*, 423 F.3d at 533-38; *United States v. Taylor*, 301 F. App'x 508, 516-17 (6th Cir. 2008) (applying good-faith exception and relying in part on the inclusion of controlled purchases in the supporting affidavit); *United States v. Harris*, 255 F.3d 288, 293 (6th Cir. 2001) (same).

The exceptions to the good-faith rule are not applicable here.  Kitchen does not argue that any of the allegations in the application were false or that Judge Carmody abandoned the judicial role.  Nor are the application and warrant either facially invalid or so devoid of a minimally sufficient nexus between the illegal activity and the place to be searched that a reasonable officer could not have relied on them.  Thus, even if the Court finds that the warrant was not supported by probable cause, the kilograms of cocaine and crystal methamphetamine, firearms, and other trafficking paraphernalia seized at Kitchen's residence should not be suppressed, pursuant to *Leon*.

### C.  An Evidentiary Hearing Is Unnecessary Because No Factual Dispute Exists.

Kitchen argues only that the factual assertions in the application do not amount to probable cause.  He does not question the veracity of the assertions or otherwise demonstrate any factual question capable of resolution at an evidentiary hearing.  Because Kitchen does not raise a question of fact, an evidentiary hearing would not aid in resolving the motion.

### IV.    CONCLUSION

The motion should be denied.

Respectfully submitted,

ANDREW BYERLY BIRGE
Acting United States Attorney

Dated: June 28, 2017

/s/Justin M. Presant
JUSTIN M. PRESANT
Assistant United States Attorney
STEVEN A. COLE
Legal Intern
P.O. Box 208
Grand Rapids, Michigan 49501-0208
(616) 456-2404